UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

FILED
99 MAR 29 PM 1:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

KENNETH A. SMITH, et al., )
    Plaintiffs; )
 )
-vs.- ) Case No. CV 91-P-1052-S
 )
 )
CITY OF PLEASANT GROVE, et al., )
    Defendants. ) MAR 29 1999

## OPINION

In September 1994, after extensive written briefs, the court heard oral arguments on various motions for summary judgment in this case. After taking the motions under submission, the court certified two questions of state statutory law to the Alabama Supreme Court. Following that Court's decision (*Smith v. City of Pleasant Grove*, 672 So. 2d 501 (1995)), the parties presented additional extensive oral and written arguments over a number of months. Currently pending are nine motions for summary judgment that, for an excessively long period of time, have been under submission awaiting a decision by this court.[1] A complicating factor that has delayed a ruling on these motions is that Kenneth Smith, who had been serving as the only representative of a plaintiff class, died in May 1998, and only earlier this month was a motion filed that would enable the court to appoint substitute class representatives.

Based on the facts set forth below and the following analysis, the court concludes that the defendants' motions for summary judgment are due to be granted. For the same reasons, plaintiff Smith's cross motion for partial summary judgment is due to be denied.

---

1. The Personnel Board of Jefferson County Defendants filed a Motion for Summary Judgment on December 6, 1993, and an Amended Motion for Summary Judgment on January 18, 1994. On January 18, 1994, the Board also filed two separate motions for Summary Judgment regarding the claims asserted by Arthur Johnson and Deborah Oss. Jefferson County filed a Motion for Summary Judgment on January 14, 1994. The City of Birmingham filed a Motion for Summary Judgment on January 18, 1994. The City of Bessemer filed a Motion for Summary Judgment on January 18, 1994. The Jefferson County Board of Health, an intervening defendant, filed a Motion for Summary Judgment on January 18, 1994. Plaintiff Kenneth Smith filed on behalf of the class a cross Motion for Partial Summary Judgment on January 19, 1994.

274

## Facts[2]

In 1935, the Alabama legislature established a civil service system for Jefferson County to ensure fair and equitable opportunities for public employment. Act No. 284 (1935). Under this Act as amended,[3] approximately 85% of the approximately 10,000 employees of Jefferson County and of the almost 20 municipalities and other local governmental agencies covered by the Act hold jobs within the "classified service," subject to the rights, protections, and constraints of the Act. Under this system, the Jefferson County Personnel Board certifies to the various appointing authorities those persons determined, through the development and administration of competitive examinations, to be qualified for initial appointment or for promotion to these classified positions. The governmental employers decide which of those persons to employ or promote. The Board is also charged with determining appropriate pay grades for these positions and with resolving claims of improper dismissal or suspension by covered employees after completing their probationary period of 12 months.

Since its initial passage in 1935, the Act has excluded from the civil service system all elected positions, as well as various categories of other governmental employees (such as members of certain appointed Boards, judges, various department heads, etc.). Since 1945 these excluded employees have been described as being in the "unclassified service." This case involves one of those excluded categories—those employed as "common laborers." Under the system, the municipalities and other governmental bodies subject to the Act have been able to employ common laborers immediately, directly, and without going through examination or certification of applicants by the Board, and to set the terms and conditions of their employment arrangements with such persons.

Issues as to whether a position should properly be treated as that of a common laborer in the unclassified service, rather than as a semi-skilled or skilled laborer or some other position in the classified

---

2. This recitation of "facts" is based on the presented materials viewed in a light most favorable to the plaintiffs.
3. The original act was first amended by Act No. 410 (1939). In 1945 major changes—though not in the provisions treating common laborers as one of the groups in the unclassified service—were made to the civil service system. Act No. 248 (1945) (frequently referred to as the "Enabling Act"). A number of amendments have been adopted since that time, the most recent being Act No. 94-564 (1994).

2

service, have been resolved by surveys or audits of job functions. A classification survey is to be conducted by the Board on all positions every 5 years. Between these 5-year surveys, special audits are performed on particular positions upon request by an appointing authority or by an employee (including an employee in the unclassified service).[4] There are procedures by which an employer or an employee can appeal such classification and paygrade decisions.[5]

Kenneth Smith filed this case in May 1991 after the Board's 1989 system-wide study of job duties and classifications and the appeals from results of that study. Smith, an African-American who was employed by the City of Pleasant Grove as a "common laborer," complained that he had been denied the opportunity to apply and be tested for one of the "skilled laborer" positions in the classified service that had been established in the Pleasant Grove workforce after the reclassification study.[6] The complaint was amended in January 1992 to add two additional plaintiffs (Oss and Johnson)[7] and two additional municipal defendants (Bessemer and Birmingham), and to assert class allegations on behalf of all employees adversely affected by the results and implementation of the Board's 1989 position reclassification study. After a hearing in July 1992, an order was entered directing that the case proceed as a class action, using the class definition that had been requested by the plaintiffs.

This class definition spawned a series of problems—such as the difficulty in determining who were members of the class (since the class was defined in terms of those "adversely affected"[8] by the

---

4. For example, in 1990 one of the three plaintiffs (Oss) requested a special audit of her position and, as a result of the audit, the position was reclassified to one in the classified service (intermediate clerk). Oss was not retained in the job, however, because, apparently lacking the necessary typing skills, she refused to take the test required for that position.

5. The Board has, however, declined to hear arguments based simply on an assertion that all common laborer positions should be brought into the classified service independent of actual job functions and duties.

6. Apparently, though the record is not clear, Smith did in 1995 pass the Board's test and at that time was placed in the classified skilled laborer position.

7. In July 1993 the court granted partial summary judgment with respect to certain of the individual claims made by Oss and Johnson.

8. There is no unanimity among employees as to whether it is better to hold a semi-skilled or skilled laborer position in the classified service rather than a common laborer position in the unclassified service. In part this depends on the particular jurisdiction by which the person is employed. In some municipalities a measure of job protection comes into play for unclassified employees in less than the 12-month probationary period specified for classified employees, and the pay rates for unclassified common laborers may exceed those for laborers in the classified service. In considering the defendants' motions for summary judgment, the court, however, viewing the evidence in the light most favorable to the plaintiff class,

(continued...)

3

reclassification study), the inclusion of both whites and blacks in the class even though the core of the complaint was a claim of racial discrimination, and the inclusion of claims not only by those dissatisfied with still being treated as unclassified workers but also by those disappointed with the classification or pay grade determinations of various positions in the classified service.

In January 1993, while a petition for mandamus relating to the class definition was pending in the Eleventh Circuit,[9] plaintiff Smith sought to be named as representative of an additional class; namely, all persons who at any time since January 1982 had been employed as full-time common laborers in the unclassified service, with a subclass to consist of only the African-American or female employees who had been in such positions. The claims to be made on behalf of this putative additional class and subclass were essentially that, as written and as applied, the Act, by excluding common laborer positions from the civil service system, violated the Fourteenth Amendment with respect to all common laborers and also resulted in racially-discriminatory employment practices by the Board and the various municipalities. Shortly afterwards, the judge to whom the case had initially been assigned recused himself.

In February 1993, following reassignment of the case to the undersigned, the court entered an order, based on its powers under Fed. R. Civ. P. 23(c)(1) to alter or modify a class certification order before a decision on the merits, that was intended to eliminate these problems.[10] The class, with Smith as class representative, was redefined as consisting of all persons who were then (or who at any time after November 1989 had been) employed as full-time common laborers in the unclassified service. The order also stated that the claims on behalf of these class members would be limited to those "for declaratory or injunctive relief based on the failure . . . [of the Board] to include within the classified service all persons carrying out the work of a 'common laborer' [in the unclassified service]." The court's order was intended to make clear that the only claims to be considered in this litigation on behalf of class members would be those challenging the

---

8. (...continued)
has assumed that persons in common laborer positions would be benefitted if they held positions in the classified service.
9. The petition was withdrawn following the court's February 1993 redefinition of the class.
10. This objective was not totally accomplished, for over the following months there continued to be assertions with respect to class claims that related to matters no longer certified for class treatment.

4

failure of the Board to include, without regard to actual job functions and performance, all "common laborers" in the classified service. The court's rationale, while not explicit in the order (though discussed orally with counsel), was that disputes regarding job functions and performance by individual employees (whether class members or classified employees with whom they might be compared) of the various governmental employers, would involve so many individual evidentiary issues as to make class treatment wholly inappropriate. Some 10,000 employees, involving approximately 820 different job classifications, were arguably affected by the 1989 reclassification study.

As refined, the class claims are that the Board's exclusion of common laborers from the civil service system: (1) violates the terms of the Jefferson County Personnel Board Enabling Act of 1945, (2) violates the Consent Decree entered in *USA v. Jefferson County*, Case No. 75-P-666-S, and (3) violates class members' rights under the Fourteenth Amendment. Smith's EEOC charge not having named or been served on the Personnel Board and not having complained about the exclusion of common laborer positions from the classified service, there are no class claims based on Title VII.[11] A contention on behalf of the class—if, indeed, such a contention can be found somewhere in the voluminous materials filed over the years—that the Board has acted with discriminatory intent when its 1989 reclassification study did not bring all common laborers, regardless of job duties and functions, into the classified service would be lacking any factual support, it being clear that the Board's action at that time was based on its belief that the statute precluded it from taking that action.

## Analysis

### I. Class Claims.

Two of the three class claims are relatively simple and can be summarily discussed. The third requires more discussion. Since Kenneth Smith, the only named representative of the plaintiff class, has died, the court must also address the question whether to grant the motion, filed March 5, 1999, for substitution

---

11. Much later, in 1994, Smith did file an EEOC charge against the Personnel Board claiming, on an individualized basis, retaliatory actions by the Board. These claims were earlier dismissed on a motion for partial summary judgment.

5

of class representatives, at least for preserving an appropriate named party through whom an appeal, if viewed as appropriate, might be made.

### A. Enabling Act Claim

The decision of the Alabama Supreme Court on the certified questions in *Smith v. City of Pleasant Grove*, 672 So. 2d 501 (1995), holds, contrary to the claims made on behalf of the class, that the Board should not have—and, indeed, could not have—under state law brought into the classified service all full-time "common laborers." Summary judgment as to this contention by the plaintiff class is due to be granted in favor of the defendants.

### B. Consent Decree Claim

There is no merit to the contention on behalf of the class that liability might arise by virtue of the Consent Decree entered in *United States v. Jefferson County*, Case No. 75-P-666. Paragraph 32 of the June 1981 Consent Decree required the Board to "*recommend* to the appropriate jurisdictions that all unclassified laborer positions with the exception of seasonal or temporary manual labor positions be brought into the classified service." (Emphasis added.) While many common laborer positions in the unclassified service have been converted into semi-skilled and skilled laborer positions within the classified service, the fact is that in the 1989-91 period, when the events giving rise to this litigation occurred, and indeed to the present date, hundreds of laborer positions have remained in the unclassified service in the approximately twenty jurisdictions subject to the Act. The terms of paragraph 32, however, were essentially hortatory in nature, were dependent in large part on enlisting support for legislative changes, were to be addressed (if at all) in CV 75-P-666, and cannot be the basis for an independent cause of action premised on the Board's lack of success in obtaining these legislative changes. Summary judgment as to this contention of liability by the plaintiff class is due to be granted in favor of the defendants.

### C. Constitutionality of the Statutory Scheme for Classified and Unclassified Service.

The class contends that the statute, by treating employees in the classified service differently from those in the unclassified service, violates the Due Process and Equal Protection Clauses of the Fourteenth

Amendment.

### (1) Due Process Claims

The basis for a class-wide Due Process claim has never been articulated by the plaintiffs. Indeed, one of the plaintiff's central themes is that the Act does not afford those in the unclassified service with any job protections—leaving them terminable at will and without any procedural safeguards—and is basically a claim that the Act does not create a property interest on which any Due Process claim must be grounded. *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Warren v. Crawford*, 927 F.2d 559 (11th Cir. 1991).

The actions of several jurisdictions in adopting "for cause" conditions and procedural reviews with respect to termination of common laborers may well have created property interests on which some due process claim might be based. Perhaps the contention on behalf of class members in those jurisdictions is that they should be upgraded to semi-skilled or skilled laborer positions in the classified service. But this would be essentially a claim that they have been denied a promotion, which the Eleventh Circuit has ruled is not a protected property interest. See *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1486 (11th Cir. 1992); *Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988).

Or perhaps the contention on behalf of such employees is that they are deprived of rights provided under the Act to semi-skilled and skilled laborers in the classified service, without having available any procedure to show that, performing the same work, they should have the same rights. But the fact is that process—due process—is provided to address such claims. As noted, job surveys are to be conducted every 5 years, and, indeed, in the 1989 survey that generated this litigation almost 10% of the unclassified common laborer positions were, based on a study of job duties, reclassified as positions in the classified service. Moreover, as also noted, employees have been able to obtain a review of the results of those surveys respecting their position and have been able to obtain, on request, a special audit of their job, with a similar right of review. The potential for disagreements about how a particular job should be classified as a result of those surveys, audits, and reviews, although perhaps forming the basis for an individual claim by a particular job incumbent, does not support a class-wide claim for lack of due process.

(2) Equal Protection Claims

A more supportable basis for the class-wide claim is that the statutory distinction between classified and unclassified positions violates the Equal Protection Clause. Ordinarily differences in treatment of two groups under a statute are to be evaluated by considering whether these differences are rationally related to a legitimate governmental purpose, and, indeed, the primary argument advanced on behalf of the class is that there is no such relationship.[12] However, if this is the appropriate standard for review, the court would hold that the Act clearly passes muster. This Act was adopted during a period of national concern that—contrary to the public interest and to notions regarding fair treatment of employees—governmental employees were often, based on a political-spoils system, replaced with persons, frequently unqualified, and that governmental employees were often selected for appointment or promotion not on the basis of merit but on the basis of political patronage.

A legislature could rationally conclude that, particularly taking into account the potential expenses and delays, to require common laborer jobs to be filled through the development and administration of minimally-meaningful tests or examinations by the Board for such positions would not serve the best interests either of governmental employers or of the job applicants. A legislature could rationally conclude that the potential for turnover and short-term employment in such positions justified a more flexible, rapid-response option for appointing authorities in filling and replacing such positions. A legislature could rationally conclude that such employees were at little risk of, and needed no special protection against, being displaced as a consequence of political-patronage actions. The exclusion of common laborer jobs from civil service systems is certainly not unique to Jefferson County.

If—as when a classification is based on a characteristic such as race—the review of Equal Protection claims is, however, to be based on "strict scrutiny," the distinction will be upheld only on, at the very least,

---

12. In a transcribed hearing before the court held on February 1, 1996, counsel for the plaintiffs reaffirmed that he was representing both black and white common laborers and that there was no rational basis for distinguishing between laborers in the classified and the unclassified service, a matter that "affects adversely all these people [in the unclassified positions] whether they are white or black."

8

a showing of a compelling governmental interest or purpose. If the classified/unclassified distinction in Jefferson County's civil service system should be analyzed under this standard, the defendants' motions for summary judgment would be due to be denied. Although, as indicated in the preceding paragraph, there were reasons why the legislature could rationally have decided to exclude common laborers from the classified service system, these reasons do not, for purposes of summary judgment, singly or in combination establish any such compelling governmental interest. It may be noted that no such blanket exclusion is provided in the civil service laws that apply to employees of the state.

So the critical question here is whether the plaintiff class has shown—or at least for purposes of summary judgment has demonstrated, subject to potential further resolution, the existence of genuine factual disputes which might lead to the conclusion—that the Act creates distinctions or discriminatory classifications based on race. This showing of a racially-based classification, such as will trigger the standard of strict scrutiny, sometimes is established because a law is racially discriminatory on its face, more frequently is established because a law, though neutral on its face, is shown to have been enacted with a discriminatory purpose, or occasionally is established because a law, though neutral on its face and enacted without discriminatory intent, has been subsequently applied to effect discriminatory purposes.

There is nothing in the Act, starting with its 1935 version and continuing through its various amendments, that has ever been racially discriminatory on its face. The various iterations of the Act, whether viewed as a whole or with particular focus on the classified/unclassified distinctions, have been racially-neutral. Section 27 of the 1935 Act precluded racial considerations as a basis for removal of, or other disciplinary actions against, covered employees, and Section 25 of the 1945 Act, which continues in effect, has prohibited any favoritism or discrimination based on race.[13] The plaintiffs do not make any contrary contentions on behalf of the class.

Was this facially-neutral Act nevertheless—whether viewed as a whole or with respect to the

---

13. Notwithstanding these provisions, the Board and the employing governmental bodies in fact adopted and applied racially-discriminatory practices for a number of years.

9

classified/unclassified distinction—adopted with an intent to discriminate against blacks? To be sure, the original version of the Act was adopted in 1935 by an Alabama legislature in which all members of the State Senate and House were white and when, no doubt, most were racial segregationists. That fact, though certainly of potential significance in considering possible racial implications of legislation, does not, however, automatically call for invalidation—or for application of a "strict scrutiny" standard—of all statutes enacted during that time period.

Unfortunately there are no official journals or other records that reflect what may have been the intent, motivation, or understanding of legislators when considering this or other legislation. What is known is that (1) because of decades of racial discrimination, few blacks were employed in 1935 by governmental bodies in Jefferson County (whether in jobs that would be subsequently treated as being in the classified service or in jobs that would be in the unclassified service); and (2) the proposed Act was taken almost verbatim (with the exception of some additional provisions creating a local Advisory Board freed from potential political influence resulting from appointment by elected officials) from a model draft furnished by the National Civil Service League, a draft designed for the purpose of minimizing the effects of patronage among public employees and insulating them from the ideological whims of changing local government administrations, and designed without any purpose to promote or perpetuate racial discrimination.

What also is known, through an historical text reciting the development of the Jefferson County civil service system, is that a key supporter of this 1935 legislation, himself a segregationist, in a re-election campaign, had to defend his support for the civil service systems against attacks by more vociferous segregationists. His responses to these political attacks, certainly racist from today's perspective, are cited by the plaintiffs in this case to show a racial motivation on his part in supporting passage of the Act. A fair reading of this history, however, makes clear that (1) the Act was not proposed or ultimately adopted as a device needed to create or enforce racially-discriminatory employment practices, but rather, despite its potential to open governmental employment opportunities to blacks, to establish a more merit-based employment system; (2) the Act was enacted over the opposition of, not with the support of, the most extreme

10

segregationists; and (3) his rhetoric was intended to dissipate political criticism by attempting to explain to a virtually all-white electorate why the Act would not mandate any fundamental changes in the racially-discriminatory employment policies then being practiced by the various municipalities.

In *Woods v. Florence*, Case No. 82-PT-2272-S (N.D. Ala), Judge Propst, in a thorough analysis of the legislative history of the 1935 Act—with which the undersigned agrees—concluded that there was no evidence of any intent or purpose to discriminate against blacks in the model draft or in the law as proposed and ultimately enacted. Nor, since these early racist remarks, has there been any indication of any racial bias or motivation when legislators considered or adopted amendments to the Jefferson County civil service laws. It may be noted that one of the two sponsors of the latest amendment (Act No. 94-564) is an African-American who is now the City Attorney for Birmingham.

The principal thrust of plaintiffs' argument for a strict scrutiny of the Act is their contention that, over the past two or three decades, the existence of unclassified common laborer positions has served as a device through which an arguably disproportionately high percentage of blacks in the total workforce of the governmental units in Jefferson County are without benefits provided to those protected by the civil service system. This case does not involve a class claim that blacks have been discriminated against when seeking positions in the classified service—such claims having been, and continuing to be, addressed in many other cases over the years.

Rather, to support their argument, plaintiffs basically point to the high proportion of blacks employed in these unclassified common laborer positions in Jefferson County during the last two decades—about two-thirds of such positions—which (at least implicitly) they would say is a disproportionately high percentage of blacks.[14] If there had continued to be an under-representation of blacks in these positions, there might have been a claim of discriminatory hiring practices by the municipalities. As it is, the claim is that the over-representation of blacks in these less well-protected jobs reflects that the statutory classification has become,

---

14. There are major deficiencies in proof concerning any such assertion, namely, in the failure to indicate the proportion, racially, of applicants or of persons presumptively in the potential job-market field.

11

in application, a device for discriminating against blacks.

It should be noted that being hired as a common laborer does not in any way disqualify or preclude the individual from seeking employment in jobs in the classified service. As the affidavit of the long-time Mayor of Bessemer, himself an African-American, makes clear, the exclusion of common laborers from the constraints of the civil service system has provided a mechanism by which cities have been able to increase the number of black employees in the classified positions, by directly hiring them as common laborers and then providing training and experience that has enabled them to succeed in the competitive civil service exams. The Mayor's affidavit also reflects that in Bessemer, which has one of the highest percentages of blacks in common laborer positions, the proportion of blacks holding such unclassified positions is less than the proportion of blacks holding semi-skilled and skilled laborer positions in the classified service. The affidavit also demonstrates that the exclusion of common laborer jobs from the classified service does not prevent cities from providing job protections to such persons.

Moreover, the defendants point to the fact—albeit as a result of racist hiring practices—that, for the first 20 years or so following its enactment, the classified/unclassified distinction in the Act for laborers would have mostly affected white employees, hardly supporting the equal protection-strict scrutiny argument now being made. The changes seen during the last 30 years in the racial composition of the unclassified common laborer group are not due to any differences in how the Board has administered the civil service system, but rather to dramatic differences in hiring practices of governmental employers during the period. These changes in turn can be largely attributed to federal statutes enacted during the 1960s. Provided by federal law with the opportunity to participate more fully and equally in the electoral process, blacks ultimately gained political dominance in such large municipal employers as Birmingham and Bessemer.[15] Statutes such as Title VII, coupled with court decrees such as that ultimately entered by consent in *U.S.A. v. Jefferson County*, CV 75-P-666-S, induced or forced cities to make major changes in their employment

---

15. Nearly 70% of the African-American class members are employed by three cities in which the Mayor is also black and in which there can hardly be a claim of employment practices discriminating against blacks.

12

practices and attitudes, sometimes through use of affirmative action programs or even goals and quotas for employment of groups such as African-Americans and women, who had previously been the victims of discrimination.

Why in recent years—particularly in cities such as Birmingham and Bessemer—have a larger number of blacks than whites been hired into unclassified common laborer positions? Is it because more blacks than whites have sought such jobs? Or because of requirements—upheld by the Alabama Supreme Court with respect to persons in the unclassified service[16]—imposed by some cities, such as Birmingham, that employees live within the city limits? Or because the cities have selected for employment a disproportionately higher percentage of the black applicants? Though not knowing the answer,[17] the court concludes that the neutral or preferential treatment of blacks seeking these positions cannot be the basis for applying, premised on some discrimination *against* blacks, a strict scrutiny evaluation to the classified/unclassified distinctions.

Concluding that the exclusion of common laborers from the classified service is not to be measured under the strict scrutiny standard, the court holds that the provisions of Jefferson County's civil service law excluding common laborers from the classified service protections of that law are not unconstitutional and are due to be upheld. Whether changes should be made is a matter for legislative consideration, not a matter for judicial mandate based on federal constitutional requirements.

It should be emphasized that this decision resolves only those claims that were certified and allowed to be maintained on behalf of the class—namely, the contention that the Board should have brought all common laborer positions, regardless of job duties and functions, into the classified service. This decision does not resolve or even address any individual claims that have been or may be made by unnamed class members asserting that the Board's failure to reclassify their particular job was racially motivated or

---

16. See *Henderson v. Arrington*, 392 So. 2d 806 (Ala. 1980).
17. As indicated in footnote 14, the parties have not provided the court with data on which this determination might be made.

13

otherwise violated federal law.

### D. Substitution of Class Representatives.

Plaintiff Kenneth Smith died on or about May 9, 1998, leaving the class without a named plaintiff as class representative. On March 5, 1999, counsel for the class filed a motion seeking to substitute Wallace Adamson and Roderick Winder as class representatives (and implicitly to add them as named plaintiffs). It appears from the motion and attached papers that Adamson and Winder are able and willing to serve as class representatives; that, having been employed as common laborers on February 11, 1993, they are members of the class; and that they have claims identical to that made on behalf of the class, namely, claims based on exclusion of common laborer positions from the classified service. Acting under Fed. R. Civ. P. 23(d), the court grants this motion and designates Adamson and Winder as representatives of the class described in the February 1993 order with respect to the class claim described in that order.

The question may be asked why, since the class claims are being dismissed, this action is necessary or appropriate. The reason is that, if an appeal is to be taken on behalf of the class, there needs to be a representative party in whose name the appeal can be taken. The designation of Adamson and Winder is not intended as a directive by the court that an appeal should be taken. That is a matter to be decided by the two class representatives and their counsel.

## II. Individual Claims

In addition to the class claims in this case, there are separate, individual claims made by the original plaintiff, Kenneth Smith, and by the later-added plaintiffs, Deborah Oss and Arthur Johnson.

### A Kenneth Smith.

Smith, an African-American, was working in 1990 as a common laborer in the Park and Recreation Department of the City of Pleasant Grove. He did not take the test for the skilled laborer position that was administered in May 1990 because, according to Smith, city officials concealed from him (but not from the other unclassified workers in his department) the fact that the test would be administered to fill three newly-established skilled laborer positions. Two white and one black co-workers successfully passed the test and

14

were awarded the skilled laborer positions. Smith believed that, although he had earlier failed the skilled laborer examination,[18] his reading skills had improved to the point where he would have passed the 1990 exam if he had known of it.[19] His EEOC charge was directed against the actions of Pleasant Grove, and the allegations in his original complaint in this case were that he had been denied the opportunity to take the exam based on his race. Subsequently, as indicated, the allegations against the Board were broadened to include the claims that would later be certified as maintained on behalf of the class.

Smith's individual claims against the Board would be due to be dismissed on their merits by granting the Board's motions for summary judgment. With respect to his allegations against the City of Pleasant Grove—many of which are controverted by the city—there are genuine issues of material fact that would preclude summary judgment. Indeed, neither Smith nor Pleasant Grove has sought summary judgment with respect to such claims.

Smith died in early May 1998, and on October 5, 1998, Smith's counsel filed a formal Suggestion of Death under Fed. R. Civ. P. 25. Then, on December 22, 1998, the attorney filed a motion for an extension of time (until March 5, 1999) to file a motion for substitution of parties, a request which the court granted on December 31, 1998. Currently pending before the court is the motion, filed March 5, 1999, to substitute Eric Smith, who on June 16, 1998, had been appointed as Administrator of Kenneth Smith's Estate.

Ordinarily this motion for substitution would be due to be granted as a matter of course, allowing Smith's individual claims against Pleasant Grove to be continued by the Administrator of his Estate. The problem is that—undisclosed in the December 1998 motion for an extension of time—the attorney for Pleasant Grove had in early July 1998 served and filed a Suggestion of Smith's Death. This fact was not disclosed in the December 1998 motion for an extension of time, and the court was unaware of this when,

---

18. At one point Smith contended that, by not allowing him to take an oral exam for the skilled laborer position, the Board had discriminated against him based on his race. All applicants for this position—white and black—have been required to complete a written exam. Smith was apparently confused by the fact that an oral exam is given for the semi-skilled laborer position, a position for which he never applied.

19. Indeed, although the record is not clear, Smith apparently was later promoted to a skilled laborer position in the classified service after successfully passing the exam for that position.

15

as a matter of routine, it granted that request.

Under Rule 25 "unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party." That 90-day period had expired more than 60 days before the December 1998 motion was filed, and the court's order purportedly granting that request for an extension was beyond its powers and of no effect. One cannot escape the obligations to make a motion for substitution within 90 days after the service of the Suggestion of Death by the device of filing a second Suggestion of Death. Smith's individual claims must be dismissed under Rule 25.

B. Deborah Oss.

Oss was directly hired in June 1988 by the City of Bessemer—probably initially on a part-time basis. When at some later time she was considered a full-time employee, she was treated by Bessemer as a common laborer in the unclassified service. According to Oss, she was directed by her immediate supervisor not to complete one of the job questionnaires that, in conjunction with the 5-year survey, were being circulated two months after she was hired. It is unclear whether this was because Oss was considered as only a part-time employee or to conceal that, without having had to go through the Board's certification procedures, she was performing general office work and not the work of a common laborer. In any event, unaware of Oss's job duties, the Board did not reclassify the position in the 1989 Study. In 1990, perhaps believing that she could be "grandfathered" into her job, Oss requested that the Board conduct an special audit of her position. The Board did so, and indeed found that Oss was doing the classified work of an intermediate clerk, and accordingly reclassified the position. As it turned out, however, to retain this upgraded position, Oss then had to pass the standard examination for that position and, indeed, since she had held the position for less than 2 years, she would have had to finish among the top three candidates. Oss, who had previously taken the test for this position but had failed the typing portion, refused to take the exam and accordingly was not retained in that reclassified position.

Although a member of the class—having been employed after December 1989 as a common laborer

16

in the unclassified service—Oss is not adversely affected by the dismissal of the class claims. As indicated, her position was in fact converted (after her request for an audit) to one in the classified service—the type of relief sought by the class—but then she failed to satisfy the requirements for that position.[20] Without reaching such additional issues as the statute of limitations, the court concludes that the individual claims of Oss—lacking any factual support for her contention that her race played any role in the claims she makes—are due to be dismissed by granting the defendants' motions for summary judgment.

### C. Arthur Johnson.

At the time of the 1989 reclassification survey, Johnson, an African-American, was employed in the Building and Inspections Department of the City of Birmingham as a skilled laborer, a position in the classified service.[21] His complaint is that he should have been reclassified to a higher position, that of maintenance repair worker.

As a part of the reclassification study, Johnson completed a questionnaire regarding his job functions and duties. Based on the information provided by him, the consultants working for the Board concluded that the position was properly classified as that of a skilled laborer. Johnson did not appeal this position classification to the Board, though he did participate in an unsuccessful multi-employee appeal regarding the appropriate pay grade of certain classifications.[22] The Board subsequently conducted two special job audits, the first in 1990 of Johnson's position, and the second in 1992 of all positions in his department. In both audits, the interviews were conducted by African-American employees of the Board. Finding that Johnson's primary duties still consisted, as he had indicated in the earlier questionnaire, of providing assistance to heating and air conditioning mechanics, the Board employees continued to conclude that his proper classification was that of a skilled laborer. He did not appeal those determinations to the Board itself. No

---

20. To the extent Oss is complaining about the actions of her supervisor in directing her not to complete the questionnaire, the sequence of events indicates she suffered no injury from these actions—indeed, probably retained her job longer that she otherwise would have—and the City of Bessemer notes that any such claims would have been resolved as a consequence of a class settlement made by Bessemer in 1991 CV 87-1520. They also would have been time-barred.

21. He is not a member of the class, and his claim is unaffected by the resolution of the class claims.

22. It was during this pay grade appeal that the Board determined, on its own, that Johnson's job should be audited.

one—white or black—was upgraded from a skilled laborer position to a maintenance repair worker.

Apparently, although the record is unclear, there was a subsequent reorganization of job duties in Johnson's department that resulted in his being upgraded to the classification he sought.

The defendants' motions for summary judgment with respect to Johnson's individual claims are due to be granted. There is no factual basis to support his claims of racial discrimination.

### Conclusion

By separate order and final judgment, the motion to add Wallace Adamson and Roderick Winder as named plaintiffs and as class representatives will be granted. The order will also grant the defendants' motion for summary judgment with respect to the class claims and will deny the plaintiff's motion for partial summary judgment with respect to such claims. The order will also grant the defendants' motions for summary judgment with respect to the individual claims of Deborah Oss and Arthur Johnson. The order will also deny the motion for substitution as party plaintiff of Eric Smith as Administrator, and will dismiss the individual claims of Kenneth Smith, deceased.

This the 29 day of March, 1999.

Chief Judge Sam C. Pointer, Jr.

Service List:
    Samuel Fisher
    Marvin L. Stewart
    Robert E. Parsons
    Thomas Bentley
    David S. Maxey
    Carl E. Johnson
    Alton Parker
    Calvin Biggers
    Michael G. Graffeo
    R. Shan Paden
    Jon B. Terry
    Jeffrey M. Sewell
    R.P Fitzpatrick, Jr.
    John T. Ennis
    Guy L. Tipton